UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER HENNING and DEANNA TETREAU,<br><br>                         Plaintiffs,<br><br>v.<br><br>NARCONON FRESH START, et al.,<br><br>                         Defendants. | Case No.: 14CV2379 BEN (RBB)<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART DEFENDANTS NI, WESTERN, AND ABLE'S MOTION TO DISMISS**<br><br>**(2) GRANTING DEFENDANT FRESH START'S MOTION TO DISMISS THE FIFTH CLAIM FOR RELIEF**<br><br>[Docket Nos. 6, 11] |

      Defendants Narconon International ("NI"), Association for Better Living and Education International ("ABLE"), and Narconon Western United States ("Western") (collectively "Defendants") move to dismiss Plaintiffs' Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  (Docket No. 6.)  Defendants assert that the allegations of the Complaint are not sufficient to establish an agency relationship between Defendants and Defendant Narconon Fresh Start ("Defendant Fresh Start"). Defendant Fresh Start separately moves to dismiss Plaintiffs' fifth claim for damages under 18 U.S.C. § 2520 for violations of 18 U.S.C. § 2511, the federal wiretapping statute.  (Docket No. 11.)  Both motions are fully briefed.

1

# BACKGROUND[1]

The Complaint alleges that Plaintiff Deanna Tetreau, while looking for an alcohol rehabilitation facility for her daughter, Plaintiff Jennifer Henning, found a website advertising dependency rehabilitation services. (Compl. ¶¶ 16-17.) She called a number on the site, left a message, and received a return phone call that day. (Compl. ¶ 17.) The caller indicated he was a drug rehabilitation counselor and directed Tetreau to another representative, Josh Penn, that made specific representations about the treatment that would be provided at Fresh Start, including that Fresh Start's program was scientifically proven and had a 70-80% success rate, that Henning would be under the care of a doctor or nurse at all times, that extensive drug and addiction counseling would be provided, and that staff was trained to treat people with addiction. (Compl. ¶¶ 18-20.) The representative directed Tetreau to Fresh Start's website which also claimed a 70-80% success rate. (Complaint ¶ 20.) NI claims a 76% success rate for all its centers, including Fresh Start, despite no published studies or other evidence supporting these rates. (Compl. ¶¶ 44, 46.) The Complaint also alleges that NI has advised some centers not to claim this rate because there is no scientific evidence to support it. (Compl. ¶ 48.)

The Complaint also alleges that these calls were recorded without Tetreau's consent and were used for further study, including high pressure and deceptive sales techniques. (Compl. ¶¶ 115, 118, 120.)

Based on the representations made, Tetreau entered into a contract for treatment for her daughter at Fresh Start and paid $34,000. (Compl. ¶¶ 21, 24.) Henning entered the program. (Compl. ¶ 24.) The contract described the Narconon Program, used by Fresh Start, as being based on a book by L. Ron Hubbard, but being secular. (Compl. ¶¶ 21-23, 25.)

---

[1] The Court is not making any factual findings and does not recount all the detailed factual allegations of the Complaint. Rather, the Court only notes those facts most relevant to the issues raised in the instant motions.

The Complaint alleges that the program, regardless of the individual's addiction, consists of eight Hubbard Scientology books containing almost no information about substance abuse treatment and a sauna and vitamin program called the "New Life Detoxification Program." (Compl. ¶¶ 21, 24.) Henning's program consisted only of Scientology teachings and practices, including, sitting for hours on end asking another patient "Do fish swim?" (Compl. ¶¶ 32-33.) Henning's progress was evaluated using the "Oxford Capacity Analysis" with questions unrelated to substance abuse. (Compl. ¶¶ 34-35.) Henning never received counseling, was never asked about substance abuse at all, and never received any education on substance abuse. (Compl. ¶¶ 59-61.)

Henning was also allegedly subjected to a daily sauna program called "New Life Detoxification," identical to a Scientology practice, that attempts to flush drug residue from fatty tissue by having individuals exercise vigorously, ingest high doses of Niacin and a "vitamin bomb" upon entering the sauna, and then spend five hours in the sauna at high temperatures. (Compl. ¶¶ 37-40.) No medical personnel supervised Henning's sauna program. (Compl. ¶ 39.) The Fresh Start facility was staffed by recent patients. (Compl. ¶ 58.) Henning was ultimately unable to complete the program because the high doses of Niacin caused acute pancreatitis requiring transportation to an emergency room for care. (Compl. ¶ 61.)

Generally, the Complaint alleges that NI, Western, and ABLE are all principals of Defendant Fresh Start. (Compl. ¶ 83.) The allegations of the Complaint assert that ABLE is at the top, overseeing drug rehabilitation, education, and criminal justice activities of the Church of Scientology, including Fresh Start and NI. (Compl. ¶ 6.) This includes controlling its agents, NI and Fresh Start, by inspecting Fresh Start centers and creating and approving all marketing materials. (Compl. ¶¶ 8-9.) The same is alleged as between Western and Fresh Start. (Compl. ¶ 5.)

The Complaint alleges more specifically that NI, ABLE, and Western govern and control nearly every aspect of Fresh Start's activities. (Compl. ¶ 64.) Numerous specific

examples are alleged. NI publishes operations manuals that direct how Fresh Start must be operated. (Compl. ¶¶65-66.) The manuals reflect detailed control over day-to-day matters, including obtaining approval from NI to demote, transfer or dismiss an employee. (Compl. ¶ 66.) Employees are required to report any misconduct to NI and Western and NI and Western then investigate all complaints at Fresh Start. (Compl. ¶¶ 68-69.) NI receives 10% of weekly gross income from Fresh Start to maintain a "building account fund" subject to NI's control. (Compl. ¶¶ 70, 74.) Western also receives a percentage of Fresh Start's gross income. (Compl. ¶ 75.) Fresh Start is required to send detailed weekly statistical reports to NI and Western. (Compl. ¶ 71.)

NI, Western, and ABLE must also approve all promotional and advertising materials, conduct inspections of Fresh Start, direct the details of services provided by employees, provide assistance with legal matters and complaints, and generally micromanage activities down to the books in the Fresh Start bookstore. (Compl. ¶¶ 72-73, 76, 78.) NI and ABLE also publish the training manuals for Fresh Start. (Compl. ¶ 77.)

## DISCUSSION

Defendants move to dismiss under Rule 12(b)(6) arguing that the Complaint lacks sufficient allegations of an agency relationship between Defendants and Defendant Fresh Start. Defendants argue that absent sufficient allegations of agency, the Complaint otherwise fails to state a claim against them. Defendant Fresh Start separately moves to dismiss only the claim for damages under 18 U.S.C. § 2520.

### I. Legal Standard

"[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (quoting

1  *Iqbal*, 556 U.S. at 678).  Motions to dismiss pursuant to Federal Rule of Civil Procedure
2  12(b)(6) test the sufficiency of this required showing.  *N.M. State Inv. Council v. Ernst &*
3  *Young LLP*, 641 F.3d 1089, 1094 (9th Cir. 2011).

4  **II.   Agency**

5        Defendants argue that the allegations of the Complaint are largely directed at
6  conduct by Defendant Fresh Start and that the allegations are not sufficient to support an
7  agency relationship between Defendants and Defendant Fresh Start.[2]  Defendants rely on
8  *Patterson v. Domino's Pizza, LLC*, 60 Cal. 4th, 474 (2014) and *Cislaw v. Southland*
9  *Corp.*, 4 Cal. App. 4th 1284 (1992).[3]  *Patterson* was decided on summary judgment and
10 rejected the idea that a franchisor's "comprehensive operating system *alone* constitutes
11 the 'control' needed" to hold the franchisor responsible for the franchisee's conduct.  60
12 Cal. 4th at 497 (emphasis added).[4]  Defendants rely on this conclusion to discount the
13 operating manuals and controls over advertising and marketing materials alleged in the
14 Complaint.  However, the *Patterson* court goes on to explain that liability may arise when
15 the franchisor "retain[s] or assume[s] a general right of control over factors such as
16 hiring, direction, supervision, discipline, discharge, and relevant day-to-day aspects of the
17 workplace behavior of the franchisee's employees."  *Id.* at 497-98.

18       This is what the Complaint here alleges in detail.  In addition to the allegations of
19 control of advertising and marketing that Defendants focus on, the Complaint also alleges
20 control of the hiring, supervision, and dismissal of Fresh Start employees.  Additionally,
21 Defendants investigated and directed the correction of all misconduct claims.  Combined
22 with allegation s of significant direction on how services are provided on a day-to-day

---

[2] With the exception of the two issues discussed below, Defendants' challenges to the Complaint are based on the lack of sufficient agency allegations.
[3] Because *Patterson* itself analyzed and applied the appellate court's decision in *Cislaw* the Court's analysis focuses on *Patterson*.  60 Cal. 4th at 494-97 (discussing *Cislaw*).
[4] The Complaint does not specifically allege a franchisor-franchisee relationship, but Plaintiffs do not dispute the application of *Patterson*.

basis, inspections to ensure compliance with its directives, and the required detailed weekly reporting, the Complaint plausibly alleges an agency relationship between Defendants and Defendant Fresh Start.  The Complaint contains detailed factual allegations as to how Defendants managed the day-to-day operations of Defendant Fresh Start that are sufficient to survive a motion to dismiss.  Defendants' Motion to Dismiss based on agency is **DENIED**.

### III.    Injunctive Relief

Defendants seek dismissal of Plaintiffs' request for injunctive relief under California Business and Professions Code section 17203 because Plaintiffs failed to meet the requirements of California Code of Civil Procedure section 382 to pursue relief on behalf of a class. (Motion at 12.)  Plaintiffs failed to address this argument.  Accordingly, Plaintiffs' request for injunctive relief under section 17203 is **DISMISSED**.

### IV.    Federal Wiretap Statute

Defendants and Defendant Fresh Start move to dismiss Plaintiffs' claim for damages under 18 U.S.C. § 2520 based on violation of 18 U.S.C. § 2511.  Section 2520 allows "a person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of the chapter" to recover for those violations in a civil action.  The chapter outlines numerous ways the chapter may be violated in 18 U.S.C § 2511.  However, § 2511 also contains an exclusion for conduct "that shall not be unlawful under this chapter," including:

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception *unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State*

§ 2511(2)(d) (emphasis added).

Tetreau's lack of consent to recording the conversations does not alone give rise to a violation of § 2511 because the statute specifically allows for a party to a conversation, here Defendant Fresh Start, to record it. Under these circumstances, there is only a violation when the recording is made with the purpose of committing a crime or tortious act. *Sussman v. Am. Broad. Cos.*, 186 F.3d 1200, 1201-02 (9th Cir. 1999) (finding case turned on purpose of interception where defendant's representative was a party to communication and not acting under color of law). "Where the purpose is not illegal or tortious, but the means are, the victims must seek redress elsewhere." *Id.* at 1202-03.

Here, the Complaint does not allege that the calls were recorded for the purpose of committing a criminal or tortious act. The Complaint alleges the calls were recorded for "further study" and disclosed to teach "high pressure and deceptive sales techniques." (Compl. ¶¶ 115, 120.) This is not sufficient. Assuming that either high pressure or deceptive sales techniques constitute a crime or a tort and that was the purpose of recording the calls, the allegation is a legal conclusion this Court does not have to accept. *Iqbal*, 556 U.S. at 678. Accordingly, Plaintiffs' fifth claim for relief is **DISMISSED.** However, the Court grants Plaintiffs leave to amend.

## CONCLUSION

Defendants' Motion to Dismiss is **GRANTED** as to injunctive relief under section 17203 and as to Plaintiffs' fifth claim. It is otherwise **DENIED**. Defendant Fresh Start's Motion to Dismiss the fifth claim is **GRANTED**. If Plaintiffs elect to amend the fifth claim, the amended pleading must be filed on or before **August 17, 2015**. If Plaintiff does not file an amended pleading, Defendants shall answer the Complaint, except for matters dismissed in this Order, on or before **August 28, 2015**.

IT IS SO ORDERED.

Dated: July 28, 2015

Hon. Roger T. Benitez
United States District Judge